Argued February 7, reversed February 28, 1928.

# THE UNION CENTRAL LIFE INS. CO. *v.* WM. KERRON ET AL.

(264 Pac. 453.)

For appellants there was a brief over the names of *Mr. C. L. Whealdon* and *Messrs. Clark, Skulason & Clark,* with oral arguments by *Mr. Whealdon* and *Mr. B. J. Skulason.*

For respondent there was a brief and oral arguments by *Mr. Milton W. Smith* and *Mr. Thomas H. Tongue, Jr.*

BROWN, J.—1–3. The law of this case is well settled. When an injured party has capacity to read a written contract signed by him and has an opportunity to do so, if no fraud is practiced upon him to prevent him from reading such writing, and he chooses to rely upon what another says it contains without requesting that it be read, he is estopped by his own negligence from claiming that he is not bound by its terms: *Lovell* v. *Potts,* 112 Or. 538 (207 Pac. 1006, 226 Pac. 1111), and cases there cited. On the other hand, if false representations are made and relied on by another, or undue influence is

practiced in obtaining a signature to a writing, it is not binding on the person so signing although he did not read it or request that it be read to him: See note, 32 Am. St. Rep. 384. However, false representations, to constitute fraud as the term is used herein, must be such representations as will deceive a person of ordinary prudence: *Wheelwright* v. *Vanderbilt,* 69 Or. 326 (138 Pac. 857).

4. It is asserted, in substance, that the plaintiff cannot be held for a wrong committed by its agent. This contention is untenable, because it is well settled that one who, with knowledge of the facts, accepts the benefit of an act done by one acting as agent ratifies the act and makes it his own: *Schreyer* v. *Turner Flouring Co.,* 29 Or. 1 (43 Pac. 719); *Grover* v. *Hawthorne Estate,* 62 Or. 77 (114 Pac. 472, 121 Pac. 808); *Alder Slope Ditch Co.* v. *Moonshine Ditch Co.,* 90 Or. 385 (176 Pac. 593); *Scandinavian-American Bank* v. *Wentworth Lbr. Co.,* 101 Or. 151 (199 Pac. 624); *Smith* v. *Mills,* 112 Or. 496 (230 Pac. 350); 1 Mechem on Agency, § 357.

5. The plaintiff asserts that Kerron has mistaken his remedy. We think that contention is put at rest by the opinion of this court in the case of *Everson* v. *Haun,* 106 Or. 612 (213 Pac. 135), where Mr. Chief Justice McBride, speaking for the court, wrote:

"The arm of equity is long. It will not reach halfway to do half equity when whole equity can just as easily be grasped. * * Nobody has ever yet defined the limits of equity and nobody ever will. It takes a case as a whole and, having obtained jurisdiction in the first place, it proceeds to administer complete relief by whatever means that relief may be achieved."

The plaintiff summoned Kerron into a court of equity, and the court will not deny him relief if he is entitled thereto.

6. Has Kerron waived the alleged fraudulent acts of Kaufman, if he be guilty of fraud? If Kerron's testimony is entitled to full credence, we think not. Waiver must be manifested in some unequivocal manner; and to operate as ratification, it must be intentional: McCabe v. Kelleher, 90 Or. 45 (175 Pac. 608). It does not appear from the record that the plaintiff's right has been impaired because of Kerron's delay in denying that he knowingly signed the second mortgage and the notes secured thereby.

To determine whether Kaufman or Kerron is telling the whole truth is the difficult question in this case. The papers were prepared by or under the direction of Kaufman, plaintiff's agent, and, when Kerron arrived at Kaufman's office, they were lying on the table ready for his signature. Kerron is an elderly man and, according to his testimony, is unable to read without the assistance of his spectacles. He testified that, at the time he signed the mortgage and notes involved herein, he relied upon Kaufman's representations as to their contents; that he believed in Kaufman, and accepted his representations as true. Although Kerron signed 26 notes and signed and acknowledged the execution of two mortgages, his testimony is, in effect, that the only papers he purposely signed were the mortgage for $12,000 and the 21 promissory notes secured thereby.

Kaufman denied the testimony of Kerron and swore that Kerron knew what he was signing, and he gave further evidence concerning Kerron's conduct subsequent thereto with reference to making payments upon the first and second mortgages that

tends to show that Kerron knew that he had made and executed both instruments and the promissory notes secured by each of them.

In support of Kerron's testimony is that of his son, Harry Kerron, who testified that he made most of the payments upon both the first and second mortgages for his father; that his father was hard pressed for money, and that he came to his rescue and made the payments without any knowledge or information concerning the second mortgage. As to his manner of making the payments he testified:

"I paid only as Mr. Kaufman would make up the amount that was due, simply went on his word without looking up any of the notes or knowing anything about the mortgage or anything else.

"Q. Did you ever know anything about the form of this loan, whether it was in one mortgage or two mortgages, anything about it? A. Not a bit; no.

"Q. Who were all your dealings with? A. Mr. Kaufman.''

With reference to the application made of the several payments, he testified:

"I can simply answer that by saying I knew nothing about what the condition was, and I thought Mr. Kaufman put them where they belonged. He said that was the indebtedness, and I made the checks out accordingly. * * ''

He further testified that, when he made the payments he believed Mr. Kaufman would apply them on the loan with the Union Central, plaintiff herein.

For the purpose of proving knowledge and a fraudulent system practiced by plaintiff agent, Kerron produced a number of witnesses, among them one John A. Meisner, a former employee of Kaufman. Concerning the distribution of circulars and the rep-

resentations of such documents with reference to the payment of commission for the procuring of loans, this witness testified, among other things, that the circulars put out by Kaufman represented that "there was no commission, no expense for—no attorney's fees, * * but there was a recording fee and there was a fee for examination of the land." He further testified that these representations as to commission caused more or less difficulty and unpleasantness in the office, because "people came back and say, 'Your circular says there is no commission; and you are charging commission.'" Continuing, he testified:

"Q. But you know there was others that come to the office and hollered afterwards? A. Yes.

"Q. They said they didn't know that they signed a second mortgage? A. Yes."

He then named John J. Havlik as the person complaining.

Havlik testified, over plaintiff's objection, that he applied through Kaufman for a loan of $10,000 from the plaintiff. He claimed that Kaufman, as plaintiff's agent, represented to him that there was to be no commission or expense in connection with the granting or procuring of the loan; that he signed a second mortgage in favor of Agricultural Credit Corporation, but that "I didn't understand it. * * I got into a row. * * I found it was all wrong."

"Q. Did you know when you signed them that you were signing them? A. At first I didn't know it; but before I got through I found it out. * *

"Q. How long after you signed it? A. I think over one day, or something, and got a lawyer and says, 'Here, it is all misrepresentation.' I was going to kick up a row. I had a lawyer all ready to commence a suit."

This witness testified that his notes were returned and his mortgage canceled.

J. T. Croeni testified that he procured a $4,000 loan from the plaintiff through Kaufman, who represented to him that no commissions were charged. His testimony continues thus:

"Q. (By Mr. Tongue.) Show you this bunch of notes * * and ask you whether or not you signed those notes at the same time. A. Yes, sir, we signed all of those notes, my wife and myself * * .

"Q. Did you know at the time you signed those notes to the Agricultural Credit Corporation of Oregon here just shown you that you were signing them? A. No. * * We just went up there to the office and signed the papers, thinking that we were signing for the money."

He further testified that unknowingly he signed a second mortgage made to the Agricultural Credit Corporation of Oregon for about $800, as commission upon the loan of $4,000.

7. Now, as to the admissibility of the foregoing testimony for the purpose of proving the allegations of fraud: It is a general rule of the law of evidence that the law will not consider evidence that a person has committed a certain act at a particular time as probative of a certain contention that he has done a similar act at some other time. However, in litigation based on fraud and deceit, where it is necessary to show knowledge, "fraudulent acts similar to those charged, and done at or near the same time, may be shown * * . So also, similar acts may frequently be relevant, because of the light which they throw on questions of motive or intent, or on an issue as to the knowledge of a person." 22 C. J. 747, 748. In treating of the subject of relevant evidence to establish a fraudulent act by another

similar act, 6 Ency. of Ev., page 35, says that evidence of such other similar fraudulent acts has often been held competent to prove a system of fraud. See, also, *Smith* v. *Gilbert,* 49 Utah, 510 (164 Pac. 1026). An interesting case holding that similar fraudulent acts to that charged will be admissible where such fraud constitutes a part of a system is *Edinburgh Life Assurance Co.* v. *Y.,* 1 Irish Report (1911), 306.

The plaintiff attempts to avoid the effects of misrepresentation relating to the matter of the commission upon the loan, upon the ground that the notes are not given for commission, but as ''an expense'' charge for looking after the loan throughout the 20 years of its existence.

Now what was the unlawful design, scheme or artifice practiced by Kaufman that induced Kerron to execute the second mortgage? Kerron testified:

''I asked Mr. Kaufman, 'Is these notes just as we agreed upon?' He says, 'Yes.' 'Well,' I says, 'It wouldn't hardly be worth my while to read them all over. It would take me half a day.' He says, 'It is just as we talked about the matter out at the farm.' ''

In this connection, Kaufman declared in court that the notes and mortgages were made in accordance with his understanding with Kerron at the farm.

On which side does the evidence preponderate? The strongest evidence in the case is of a documentary nature. Among the papers appears a statement as to commission, signed by Kerron, wherein he declared:

''Nor will I pay any such commission or brokerage to anyone except ——— dollars ($1,538.38), payable to Agricultural Credit Corporation of Oregon.''

Then follows a description of the notes making up this amount. On the back of the above statement is a signed receipt from Kerron, acknowledging the disbursement of the money requested as a loan. This receipt for disbursements seems to have been executed at a time subsequent to the execution of the mortgage and notes in question. When the statement as to commission was submitted to him upon cross-examination, he was asked the question:

"Q. I show you this paper, Mr. Kerron, and ask you if that is your signature. A. I don't remember that, sir, at all. * * Well, sir, I will deny I ever signed that, or ever saw that before. * *

"Q. It is not your signature? A. That is not my signature. I never saw that before, sir, and that is a fraud. * * I will say, gentlemen, that this one is all bogus. * * I will swear I never signed it."

When compared with his admitted signatures it appears to be genuine, and when shown to Harry Kerron, his son, it was identified by him as the signature of his father.

On January 10, 1918, Kaufman, plaintiff's agent, wrote Kerron at his known address as follows:

"Your note for $360 in favor of the Agricultural Credit Corporation of Oregon will mature February 1, 1918."

On November 9, 1918, he again wrote Kerron concerning the balance due on the foregoing note. On January 5, 1919, he wrote as follows:

"The second mortgage note for $317 in connection with your loan will be due February 1, 1919."

On February 6, 1919, and again on March 1, 1919, Kaufman wrote Kerron about the same matter. On March 21, 1919, C. L. Whealdon, plaintiff's attorney, wrote him calling his attention to the notes that

were due under both the first and second mortgages. On May 6, 1919, Kaufman wrote him and registered the letter, and on July 14, 1919, again wrote concerning the same matter. On January 8, 1920, Kaufman wrote to defendant Kerron and to Harry Kerron, the son, and called their attention to the second mortgage. On February 10, 1921, he wrote defendant Kerron as follows:

"The second mortgage note for $317 in connection with your loan was due February 1, 1920, also note for $291 due February 1, 1920 (1921)."

On March 18, 1921, he wrote Harry Kerron with reference to the second mortgage notes. On April 6, 1923, he again wrote Harry Kerron concerning the second mortgage, and on April 13, 1923, plaintiff's attorney wrote defendant Kerron with reference to the payment of the amount due on the paper in controversy.

8. A perusal of the foregoing documents makes it difficult for us to believe that defendant Kerron knew nothing of the second mortgage until a short time prior to the institution of this suit. The evidence shows that he is intelligent; that he writes an excellent hand for a man of his years, and that he appears to be capable of looking out for himself. The $1,538.38 would seem to the writer to be an exorbitant commission for a $12,000 loan. However, this commission, in connection with the 6 per cent per annum to be paid by Mr. Kerron on the first mortgage, constitutes but 7 per cent on the entire loan for the period of time it had to run in accordance with the plan of payment.

9. The law applicable to the facts in this case was stated by the court in *Whitney* v. *Bissell*, 75 Or. 28 (146 Pac. 141, L. R. A. 1915D, 257), as follows:

"The rule as to the knowledge of the fraud before there would be an acquiescence therein is subject to the principle that notice of acts and circumstances which would put a man of ordinary prudence and intelligence upon inquiry is equivalent in the eyes of the law to knowledge of all the facts a reasonably diligent inquiry would disclose: 6 Cyc. 305; Clark on Contracts, p. 236."

Pertaining to the law of rescission, see *Robinson v. Cable*, 109 Or. 579 (217 Pac. 624), and the local citations therein noted.

In view of the testimony and the law applicable thereto, this case is ordered reversed, and a decree will be entered in accordance with the prayer of the complaint. Neither party will recover costs in this court.                                              REVERSED.

RAND, C. J., and ROSSMAN and McBRIDE, JJ., concur.