(No. 6334. April 5, 1937.)

WORT WEST, Respondent, v. E. F. PRATER, Sheriff of Twin Falls County, Idaho, and ALLIS-CHALMERS MFG. CO., a Corporation, Appellants.

[67 Pac. (2d) 273.]

584

Merrill & Merrill for Appellants.

Chapman & Chapman for Respondent.

AILSHIE, J.—In July, 1930, at the request of respondent, Harley Williams negotiated a deal for a second-hand bean huller, for which respondent was to pay the Advance-Rumely Thresher Co. $950, to be evidenced by two promissory notes. Respondent signed an order specifying "One S. H. Rumely Bean Huller complete; this machine second hand accepted present location, present condition." Two promissory notes, each for $475, dated August 19, 1930, were executed by respondent, one due November 1, 1930, and the other November 1, 1931; the first one was paid "6–5–31" and was returned to respondent in a letter dated February 14, 1934.

According to testimony of respondent, he called at Williams' office and Williams told him he had "them papers there ready to sign," and that he signed the notes and what purported to be a contract; he says Williams informed him that it was "just a contract." Being without his glasses, respondent did not read the papers. He testified that he had worn glasses for ten or twelve years; his eyesight was impaired and he could not read fine print without his glasses.

The receipt signed by respondent August 19th covers "one S. H. Rumely Bean Huller #9" and specifies "that the notes given by the undersigned to the company for said goods and the mortgage securing said notes were examined and read before they were executed, and the same are delivered in fulfillment of said written agreement." A chattel mortgage covering the bean huller and a Do-All tractor was signed by respondent on the same date; he testified that he did not learn until about two years and a half afterward that this mortgage covered the Do-All tractor. In the meanwhile, and in October, 1930, respondent paid the purchase price, note and mortgage given in October, 1929, for the Do-All tractor and the original mortgage was released.

Subsequent to the execution of the notes and mortgage, the Allis-Chalmers Mfg. Co., one of the appellants herein, purchased the business and assets of the Advance-Rumely Thresher Co., Inc., retaining Williams as its agent, and took an assignment of these notes and the mortgage. The bean huller was purchased to be used for threshing beans for hire. It was furnished to respondent without a back beater, a second cylinder, running at a different speed and located just behind the back cylinder of the huller and is designed to pull the bean straw away from the cylinder and throw it out on the straw stack. There is divergent testimony in regard to the necessity of using a back beater with a bean huller An agent for the company testified that back beaters were first placed in the hullers in 1926; that they were "put in there . . . . for sales talk" and that there was not a dollar's difference between the two kinds of machines. In the fall of 1931, after having used the machine one year, respondent made demand on the company for a back beater, or, as he stated it: "a fully equipped bean huller." The company then furnished respondent with a back beater, as hereinafter more particularly stated.

June 15, 1934, appellant proceeded, by affidavit and notice under the statute, to foreclose the mortgage on the bean huller and Do-All tractor. June 25th respondent procured from the district court a temporary restraining order, enjoining appellants from proceeding with the foreclosure of the chattel mortgage and from selling the Do-All tractor and bean huller.

July 17th an injunction *pendente lite* issued, commanding appellants to desist and refrain from proceeding with the summary foreclosure of the mortgage and from sale of the tractor and bean huller.

Respondent by his complaint in the lower court raised the issue and made the contention that he was not liable for the contract price of the bean huller, as agreed upon in 1930, and that there was no actual delivery of a complete machine until 1931, at which time the back beater was furnished and installed; and that the price, which he was liable to pay to the company, was not the contract price but only the reasonable value of the machine as of July 31, 1931, after the installation of the back beater. The cause was tried to the court and jury June 10, 1935. The court held with respondent on these contentions and found that the reasonable value of the machine, after the installation of this equipment, was $700, whereas the contract called for $950. The court entered judgment decreeing, (1) that the promissory notes and mortgage ''are null and void by reason of fraud''; and that appellant should be ''permanently enjoined and restrained from proceeding with a summary foreclosure of said chattel mortgage and . . . . that plaintiff [respondent] be returned to the possession of the same'' (the property); and (2) that defendant (appellant) have judgment for the balance due on an open account for the reasonable value of the bean huller as of the date of July 31, 1931, when the back beater was delivered.

The conclusions we have reached as to the validity of the contract will serve to dispose of the whole case. We hold, without hesitation or doubt, that the record fails to disclose any fraud that vitiates or avoids the contract. No confidential or fiduciary relation has been shown as existing between Williams, the respondent's agent, and West. While they were neighbors, who visited back and forth on very friendly terms, there is nothing to show that such relation was extraordinary for acquaintances; nor did it extend beyond a social nature into any confidential business or financial relation, more than that ordinarily arising between vendor and purchaser of goods and merchandise. In business matters they had dealt at ''arm's length.'' The extent of their

business dealings, as stated by Mr. West himself, had been: "I bought a manure spreader of him and then I bought a tractor and a bean huller" (the one in controversy). It requires far more than this to establish a confidential relation, or to constitute fraudulent misrepresentation. (2 Pomeroy's Eq. Juris., 4th ed., sec. 876 et seq.; *Lillie v. Shriver*, 190 Iowa, 861, 179 N. W. 632.)

Now let us examine the evidence to see whether respondent was induced to execute these notes and the mortgage through any fraudulent misrepresentation. In order to fairly determine that fact, let us consider the testimony of the debtor himself. He testified:

"Q. Now, prior to the purchase of the bean huller, Mr. West, what was the nature of your acquaintance with Mr. Williams as to being intimate or otherwise?

"A. Well, Harley and me, I used to go there to his place, we would visit there and he would come down to our place and we run around a quite a little bit together and we was, I thought quite, pretty good friends; he used to come down to our place on Sunday for dinner at different times.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. And what security were you to give for the payment of those notes?

"A. I told him I wouldn't give no security.

"Q. Now then, did you later sign some papers?

"A. Yes, sir.

"Q. In connection with this transaction?

"A. Yes, sir.

"Q. And where did that occur Mr. West?

"A. Occurred there on his desk in his office.

"Q. What time of the day, do you remember?

"A. Well it was along in the evening, I don't remember the time, but it was along in the evening.

"Q. Who was present when that transaction occurred?

"A. There was Harley and Mr. Madelin, I believe his name is; he's a notary, and myself.

"Q. I will ask you Mr. West what is your ability to read without your glasses?

"A. Well, it's all on how large the print is.

"Q. What do you mean by that?

"A. Well I can read the headlines on a paper, I can read ordinary print or a little larger, but fine print I can't read.

"Q. Was that the condition of your eyesight on this occasion?

"A. Yes, sir.

"Q. Mr. West relate to the jury what occurred at the time you signed these papers?

"A. Well, about all there was occurred, Harley told me he had them papers there ready for me to sign and I said, 'All right, I am ready to sign them any time,' and went back there and he had two or three papers I forget which I signed; a note and one or two other papers and I said, 'Why here, I wasn't to give any security on these, the notes was all I was to give,' and he said, 'The company required a contract anyhow and that's just a contract.'

"Q. What did you do after Mr. Williams made that statement to you?

"A. I signed it.

"Q. Was there any mention made at that time in regard to the tractor?

"A. The tractor never was mentioned in the whole deal, never heard of it at all.

"Q. I will ask you Mr. West when you first learned that the tractor was, that you had executed a chattel mortgage on the tractor?

"A. Oh, it was—

"Q. That is, with the bean huller?

"A. It was about two years and a half after I signed it; I wasn't paying them and Perkins wrote me a letter and told me he was going to foreclose on the tractor and bean huller.

"Q. And that was the first time?

"A. That was the first time I knew there was a mortgage on it.

"Q. I will ask you Mr. West why you signed the papers in Mr. Williams' place of business that evening?

"A. Why I signed them?

"Q. Yes.

"A. Well he had them ready and he told me he had them papers ready to sign, and I just signed them.

. . . . . . . . . . . . . . . .

"Q. I will ask you Mr. West to state whether or not you relied on Mr. Williams' statements made to you that evening in signing the papers you signed there at that time?

"A. Yes, sir.

"Q. I will ask you Mr. West whether you read the papers at that time?

"A. No, I did not.

"Q. That you signed?

"A. I did not.

"Q. Why didn't you read them?

"A. I didn't have my glasses with me.

"Q. Did you inform Mr. Williams of your inability to read the papers at the time you signed them?

"A. I wouldn't say whether I did or not, I don't know, though that is the reason I didn't read them."

On cross-examination respondent further testified.

"Q. But you do remember signing all these papers that day?

"A. Yes, sir.

"Q. Now you stated you didn't read any of these papers?

"A. I didn't have my glasses, I didn't read none of them.

"Q. You didn't know whether you were signing notes for four hundred seventy-five dollars or whether you were signing for a larger amount?

"A. No, sir, I didn't.

"Q. Didn't you have any idea what you were signing?

"A. Why sure, I supposed our deal would go through the way we talked it; if I had an idea that was in there or the note too big, or anything, I wouldn't have signed up.

"Q. But you didn't read to find out?

"A. No.

"Q. How long has it been since you wore glasses?

"A. About ten or twelve years.

"Q. Is it customary for you to leave your glasses home when you are signing important papers like these?

"A. I didn't come up especially for that, I forgot my glasses once in a while yes.

"Q. You knew you were signing those notes and mortgages for at lease nine hundred dollars?

"A. Yes, sir.

"Q. And yet you signed those without even reading them?

"A. Yes, sir.

"Q. Mr. Williams didn't tell you what was in there did he?

"A. No, sir, he didn't indeed.

"Q. Now if you had had your glasses you would of course, you would of read these papers, looked them over?

"A. I would have looked to see what was in there and looked to see what the notes was; just scanned over it, probably wouldn't have read them all.

"Q. So the reason you didn't read these instruments was because you didn't have your glasses?

"A. Yes, sir.

"Q. Now that order that you signed, are you sure when you signed that?

"A. Signed it when I signed the rest of them papers, as well as I remember.

"Q. Now are you sure you didn't sign this instrument in July when you and Mr. Williams was talking about this purchase?

"A. I don't remember but signing but one bunch of papers, that was when the mortgage and note was signed.

"Q. Now it is possible you signed this before?

"A. I don't believe, I think I would have remembered it.

"Q. You didn't read the order when you signed it, you say?

"A. No.

"Q. Now this receipt for machinery where it says here that the notes given by the undersigned to the company for said goods and the mortgage securing said notes were examined and read before they were executed, and the same are delivered in fulfillment of said written agreement—now you say you didn't read that when you signed it?

"A. I did not.

"Q. And that was because you didn't have your glasses?

"A. Yes, sir.

"Q. Mr. Williams didn't do anything to prevent you from reading these papers, did he?

"A. No, sir, he did not."

A study of this testimony of Mr. West discloses that he knew the "papers" he was executing related to the deal for the bean huller and that the "papers" amounted to "security," as he said to Mr. Williams, "Why here, I wasn't to give any security on these, the notes was all I was to give." He must therefore have read the mortgage sufficiently to ascertain that it was some kind of "security" or else Williams so informed him. He further testifies that Williams replied, "the company required a contract anyhow and that's just a contract." While West might very well have inferred, from the latter statement, that Williams meant to convey the idea that the "contract" was not "security" or a mortgage, still he was put on notice by being plainly informed that it was a *contract* of some kind, and he says that Williams *"didn't tell"* him *what* was in the *contract*; nor does he claim that he asked Williams for a statement of its contents.

■ When asked, "Why didn't you read them"? he replied: "I didn't have my glasses with me." It does not appear that Williams knew he didn't have his glasses or that he required glasses to read,—he does not claim that he so informed Williams. On the contrary, it does appear from the foregoing that he read at least some part of the mortgage. It is admitted that West didn't always have his glasses with him and that he sometimes went away on business without them. Williams did nothing to prevent West from reading the mortgage and made no false representation as to its contents, except whatever implications may be drawn from the statement, "that's just a contract." There is nothing shown to indicate, either directly or inferentially, that Williams knew that West did not read the documents he signed; besides they were duly acknowledged and attested before a notary. It seems clear that Mr. West had abundant opportunity of learning the exact contents of the papers he was asked to execute before signing them. If he could not see to read them without his glasses, he could have had either Williams or the notary read the documents to him; or had he told Williams of his inability to read without glasses, and Williams

594

had misread or misstated the contents, then we would be confronted with a very different question. (*Constantine v. McDonald*, 25 Ida. 342, 137 Pac. 531.) As the record stands, we find no evidence of Williams having practiced any fraud or overreached Mr. West in this transaction. It is a well-established rule of this court that:

"Fraud is never presumed, but must be established by clear and convincing evidence, especially where integrity of written instrument is assailed."

(*Smith v. Thomas*, 42 Ida. 375, 245 Pac. 399; *Smith v. Johnson*, 47 Ida. 468, 276 Pac. 320; see, also, *Widincamp v. Patterson*, 33 Ga. App. 483, 127 S. E. 158.)

In order to relieve one from responsibility for a contract on the grounds that he was induced to sign it by false representations, it must be shown that the representations were false and fraudulent and such as would be likely to deceive a person of ordinary prudence.

"Fraud which would relieve a party who can read must be fraud which prevents him from reading."

(*Widincamp v. Patterson, supra; Union Central L. Ins. Co. v. Kerron*, 128 Or. 70, 264 Pac. 453.)

On the other hand, voluntary "failure or inability of party to read written contract before signing it is not ground for setting it aside." (*Hampton v. Lee*, 49 Ida. 16, 285 Pac. 1023; *Milner v. Earl Fruit Co. of N. W.*, 40 Ida. 339, 232 Pac. 581; see, also, *Lillie v. Shriver et al.*, 190 Iowa, 861, 179 N. W. 632.) One may be, and it sometimes happens that he is, estopped by his own negligence to deny liability on a written instrument signed by him without having read it. This is true where he had opportunity to read the document and was not fraudulently dissuaded or prevented from reading it. (*Upton v. Tribilcock*, 91 U. S. 45, 23 L. ed. 203; *Widincamp v. Patterson, supra; Union Central L. Ins. Co. v. Kerron, supra; Lovell v. Potts*, 112 Or. 538, 207 Pac. 1006, 226 Pac. 1111; *Kimmell v. Skelly*, 130 Cal. 555, 62 Pac. 1067.)

We conclude that the court erred in holding the notes and mortgage void for fraudulent misrepresentation at the time of their execution.

Another contention made by respondent and sustained by the trial court and assigned as error is, that appellant

failed to deliver a complete machine (bean huller) in August, 1930, when the delivery was made and machine was received; and that a complete and fully equipped machine was not delivered until July, 1931, when the ''back beater'' was delivered and installed. The court so found and held and refused to allow the company the contract price of $950 for the machine as agreed upon in August, 1930, but heard evidence as to its *reasonable value in July, 1931,* after the ''back beater'' was delivered and installed and rendered judgment on that basis. That was an erroneous finding and conclusion for the following reasons: The machine which respondent purchased was not a new one but was a used machine for which the agent, Williams, traded; and respondent went out and examined the machine before purchasing it and before Williams traded for it; and at the time of the examination and purchase it was not (and *this* machine never had been) equipped with a ''back beater.'' Furthermore, he continued to use it after learning that he had no back beater and did not return it or offer to rescind.

The machine was originally purchased by a Mr. Adkins in 1925 and was used by him successfully during 1925 to 1929, both inclusive, without a ''back beater.'' This machine had not been constructed originally with a view to using a ''back beater'' attachment; in fact this back beater, according to the evidence, was not invented and put in use until 1926. After the company began making the back beater it furnished one free to each previous purchaser of a machine who was willing to pay the freight for shipment, and one was accordingly sent to Adkins, though he never installed or used it. It seems that the necessity for or advantage of its use is dependent upon the extent or abundance of the bean foliage or straw and its state of desiccation.

After examining the machine at Mr. Adkins' place and deciding to take it, he signed an order reciting: ''This machine second hand accepted present location, present condition.'' It seems most likely that this order was signed at the same time and under the same conditions that the notes and mortgage were signed but for reasons heretofore stated, we think respondent was chargeable with knowledge of its contents.

596

█ Lastly, we have to consider the question of damages. It was claimed by the plaintiff in the lower court that the bean huller should have been equipped with a back beater and that since it was not so equipped for a year after he received and began to use it, there was, in a legal sense, no delivery of a complete working machine until July 31, 1931, when the back beater was installed; and that he only became liable for the reasonable value of the machine as it stood of that date, which he claims became the true and legal date of delivery. The trial court sustained this contention. The holding was erroneous. One cannot both ''eat his cake and keep it.'' The purchaser who concludes that the article purchased is not what it was represented to be, or what he had a right to believe it was or should be, cannot, after such discovery, go on using the article and thereafter refuse to pay the agreed purchase price. He may after such discovery repudiate the contract, return the article and demand return of any consideration paid. This is a rescission. He may, on the other hand, retain the article and claim such damages as he has sustained through breach of the contract by the vendor. (*Wilson v. Sunnyside Orchard Co.*, 33 Ida. 501, 511, 196 Pac. 302, and cases cited.)

█ But it is claimed that failure to furnish the back beater with the machine when delivered in August, 1930, amounted to a partial failure of consideration and released the purchaser from payment of the consideration as originally contracted; and that upon delivery of the back beater in July, 1931, an implied contract arose whereby the vendor agreed to sell and the vendee to purchase the machine as then equipped for its *reasonable market* value. Such a contention cannot be sustained. If, in fact, when the sale was originally made to West, it was contemplated (which we do not decide) that the machine should be equipped with a back beater, the lack of that equipment was discovered before the back beater was actually furnished and installed, and no rescission was ever claimed, but the equipment was demanded, accepted and installed; and all that was then or thereafter claimed by West was a settlement, or, as he testified, ''get reimbursed for the damage I had had from that beater not being in there the first year.''

It follows from the conclusions above stated that the judgment must be reversed. In view of the fact that respondent claims that he should have received the back beater along with the huller, at the time he purchased the machine, and that he sustained damages by reason of the agent's failure to furnish this attachment, it will be necessary for the trial court, either with or without the aid of a jury, to determine whether or not Mr. West should have been furnished a back beater with the machine, *at the time of the purchase and delivery of the machine*; and if the court finds that he should have been originally furnished with this equipment, then it will be necessary to determine the amount of damage, if any, which respondent has sustained by reason of the failure of the company to furnish this attachment prior to the time it was actually delivered.

The judgment is reversed and the cause is remanded with direction to the trial court to take such further proceedings as may be necessary to a final judgment, in harmony with the views herein expressed. Costs awarded in favor of appellants.

Morgan, C. J., and Budge and Givens, JJ., concur.

ON PETITION FOR REHEARING.

(May 3, 1937.)

AILSHIE, J.—■ Appellant has filed a petition for a modification of our opinion herein so as "to direct the district court who tried said cause to enter judgment in favor of the appellants." In support of the motion appellant urges that respondent's action was not commenced and has not been prosecuted for damages but rather for injunction on account of alleged fraud and failure of consideration. That is true, but it is also true that respondent has consistently contended that he should have been supplied with a back beater at the time the huller was delivered, and that he suffered a direct loss on account of the failure of the company to deliver the back beater with the machine. So it happens that, under the peculiar circumstances of this case, while the company is

entitled to proceed with its foreclosure, the plaintiff here (defendant in the foreclosure proceeding) should be allowed to offset his indebtedness by the amount of whatever damages (if any) he has sustained which have arisen out of the transaction involved in the litigation. (Sec. 5–613, I. C. A.; *Willman v. Friedman,* 4 Ida. 209, 38 Pac. 937, 95 Am. St. 59; *Wollan v. McKay,* 24 Ida. 691, 135 Pac. 832; *First Sav. Bank v. Sherman,* 33 Ida. 343, 195 Pac. 630; *Tage v. Tage,* 36 Ida. 472, 211 Pac. 548.)

For these reasons when this case goes back to the lower court, the plaintiff should be allowed to amend his complaint, if he desires to do so, in such manner as to present the issue as to whether he should have been furnished a back beater and what, if any, damages he has sustained by reason of the alleged failure of the defendant to furnish him a huller, equipped with a back beater, as he contends should have been done.

It has been suggested that the appellant, Allis-Chalmers Company could not be held for the damages here claimed, for the reason that it is a mere assignee of the note and mortgage and did not make the sale to respondent. That contention is answered by the fact that the Allis-Chalmers Company took over the entire business and assets of the Advance-Rumely Company and when it took the note and mortgage here in question, it received them subject to any defense that the respondent West might have against them arising out of the transaction on which they were given.

Morgan, C. J., and Holden and Givens, JJ., concur.