Argued November 20, reversed December 3, 1952

POWELL ET AL *v.* SHEETS ET AL

251 P. 2d 108

*George P. Winslow,* of Tillamook, argued the cause and filed a brief for appellants.

*Robert Y. Thornton,* of Tillamook, argued the cause and filed a brief for respondents.

Before BRAND, Chief Justice, and LATOURETTE, WARNER and TOOZE, Justices.

TOOZE, J.

This is a suit brought by Floyd Powell and Wesley Powell, as plaintiffs, against Robert A. Sheets and Frances J. Sheets, his wife, and Harold Guthert, as defendants, to reform a written contract for the sale of timber, and for injunctive relief. The case, a suit in equity, was tried to the court without the intervention of a jury. Judgment in favor of plaintiffs and against defendants Robert A. Sheets and Frances J. Sheets in the sum of $2,421.28 was entered. The suit was dismissed against defendant Harold Guthert with prejudice. Defendants Robert A. Sheets and Frances J. Sheets appeal from the judgment against them.

Defendants are the owners of the northeast quarter and the southeast quarter of the northwest quarter of section 12, township 3 south, range 10 west of the Willamette meridian, in Tillamook county, Oregon. Hereafter we shall refer to the northeast quarter of the northwest quarter as the "north forty", and to the southeast quarter of the northwest quarter as the "south forty", that being the designations given the two tracts of land by the parties to this litigation.

Upon each of the forty-acre tracts there was a stand of merchantable timber, consisting of hemlock, old-growth fir, and some second-growth fir. The stand on the south forty was more extensive and was composed of better timber from the standpoint of being merchantable.

On November 8, 1949, plaintiffs and defendants entered into a written agreement for the sale of the timber on the north forty. The provisions of that agreement so far as material to our discussion are:

"Witnesseth; That the said parties of the first part [plaintiffs] for and in consideration of the covenants hereinafter contained on the part of the said party of the second part, do covenant and

agree to and with the said party of the second part as follows:

"To purchase any and all the merchantable timber contained on the following premises to-wit: *The Northeast quarter* of the Northwest quarter of Sec. 12 Township 3 South, Range 10 of Willamette Meridian, all being in Tillamook County and in the State of Oregon.

"That the parties of the first part agree to pay unto the party of the second part at the rate of $7.00 per thousand board feet for any and all old growth fir and $4.00 per thousand board feet for second growth fir and hemlock contained on the aforesaid premises, the per thousand board feet shall be arrived at from Scribner's scale (Columbia River); with the payments to be made at the aforesaid rates at the end of each month for all logs delivered for sale by the parties of the first part; said timber to be removed by Nov. 8, 1950, unless further extension of this contract is agreed to.

"That the parties of the first part agree to construct a bridge across the creek and build any necessary road for the removal of the timber at their own expense.

"That the party of the second part agrees to sell to the parties of the first part all the timber on the aforesaid premises and as aforesaid." (Italics ours.)

In their complaint filed in this cause on May 20, 1950, plaintiffs allege the making of the aforesaid contract and then charge as follows:

"II.

"That the agreement pursuant to which said contract was executed was for purchase of all merchantable timber contained in the *southeast quarter* of the northwest quarter of Section 12, Township 3 south, Range 10 west, Willamette Meridian.

"III.

"That in drawing said agreement the scrivener by mistake made the same for the purchase and

sale of timber in the *northeast* quarter of the northwest quarter of Section 12, Township 3 south, Range 10 west, Willamette Meridian.

## "IV.

"That plaintiffs hired certain fallers and buckers to go on the southeast quarter of the northwest quarter of Section 12 and caused them to fall all of the merchantable timber thereon, at plaintiffs' expense.

## "V.

"That plaintiffs and defendants Sheets relied upon the accuracy of the scrivener and did not check on the legal description in said agreement nor discover the erroneous description until on to-wit, the 1st day of April, 1950, when plaintiffs notified the defendants Sheets thereof and requested defendants Sheets to join in endorsement on the agreement or other suitable writing to rectify the error.

## "VI.

"That the defendants Sheets then and ever since have refused to join, in any way, in rectifying the error.

## "VII.

"That defendants Sheets have pretended to make a sale of said timber to defendant Harold Guthert and that said Harold Guthert is now in the possession thereof and in the process of removing said timber." (Italics ours.)

Plaintiffs pray a decree enjoining the sale and removal of the timber during the pendency of the suit; that the contract be reformed in accordance with the actual intention of the parties; that the agreement as reformed be specifically performed; and for an accounting for profits on any logs removed prior to the filing of the complaint.

Defendants' answer consists of a general denial.

On the day of trial (January 4, 1951), plaintiffs were permitted to file a supplemental complaint. In this pleading plaintiffs alleged that since the commencement of the suit, the logs on the south forty had been sold and removed by defendants; that in selling said timber defendants had received the benefit of plaintiffs' expenditures for felling and bucking, which expenditures were alleged to aggregate the sum of $1,828.15. Plaintiffs further alleged as follows:

## "IV.

"That prior to the time of defendants' breach of contract as alleged in plaintiffs' original complaint, plaintiffs had made the necessary arrangements, including locating and contracting for logging equipment necessary, to begin and carry on successfully said logging and made all necessary arrangements pursuant to said contract with defendants Sheets; that by reason of said breach of said defendants Sheets, in failing to perform said contract, the plaintiffs have sustained considerable damages.

## "V.

"Furthermore, by reason of said breach of said defendants Sheets, plaintiffs have been thereby deprived of reasonable profits which would have otherwise accrued to them on the logging and marketing of said timber, but for the breach of said defendants Sheets as alleged in plaintiffs' original complaint herein."

Plaintiffs then repeated their prayer for reformation of the contract and prayed that defendants be required to account for the felling and bucking expenditures, for the reasonable profits that would have accrued to them on logging and marketing the timber, and for further damages in the sum of $1,000.

It was stipulated between the parties that the allegations of the supplemental complaint should be deemed denied by defendants.

Upon conclusion of the trial, the trial court in a memorandum opinion found that the evidence was insufficient to authorize the court to reform the contract as prayed for in plaintiffs' original and supplemental complaints. The court then said:

"However, since the plaintiffs have asked for general equitable relief the court is of the opinion that it should retain jurisdiction of the matter and grant the equitable relief that is indicated by the evidence in the case."

The court then found that plaintiffs were entitled to recover $1,471.21 on account of their expenditures for felling and bucking, and the further sum of $950.61, as one-half the profits realized upon the sale of the logs.

Thereupon, plaintiffs presented a proposed decree in accordance with the court's memorandum opinion. Defendants immediately filed written objections thereto, accompanying their objections with a proposed decree in keeping with their theory of the case. The material portions of the objections are:

## "II.

"Defendants object to the proposed finding to the effect that this court should retain jurisdiction of this cause after the court has expressly found that the evidence was insufficient to authorize the court to reform the contract pleaded by plaintiffs, for the reason that after plaintiffs' request for reformation has been disposed of adversely to plaintiffs then no equitable grounds remain authorizing an equity court to retain jurisdiction.

"* * * * * *

## "IV.

"That the finding and conclusion of law, to the effect that this court should retain jurisdiction and award plaintiffs a judgment, is erroneous, contrary to the law, and not based upon any fact, found by the court, giving this court the right to retain jurisdiction and to determine the controversies between plaintiffs and defendants in an equitable proceeding; that under the findings of the court, as set forth in the memorandum opinion of the court, the only conclusion of law which can be properly made is that this cause should be dismissed as to all of the defendants.

## "V.

"That the failure of plaintiffs to allege and prove sufficient facts to give a court of equity jurisdiction makes it necessary to transfer this cause to the law side of the court where each party is entitled to a trial by jury."

The principal contention of defendants on this appeal is that the trial court, sitting as a court in equity, erred in retaining jurisdiction and entering a money judgment against defendants after it had determined, as a matter of fact, that plaintiffs had failed to prove their allegations upon which equitable jurisdiction was predicated, and that, upon defendants' request, it should have dismissed the cause or transferred it to the law side of the court where jury trial might be had.

■ An examination of the record discloses that plaintiff had no cause of suit for reformation of the contract. It is not a question of mere insufficiency of the evidence to warrant such relief; there is a total lack of evidence to support such a claim. All additional relief prayed for by plaintiffs in their original complaint is based entirely upon a reformed contract. In other words, if the contract is not reformed, there

is no basis whatever for the additional relief in equity as prayed for.

To illustrate the total lack of evidence to support a claim for reformation of the contract, we quote briefly from the testimony of plaintiff Wesley Powell. Upon direct examination, he testified as follows:

"Q Do you recall about when it was that you first met Mr. and Mrs. Sheets?

"A November 5th, I believe—no, it was the first part of November.

"Q Where did the meeting take place?

"A At their place.

"Q Just in your own words will you describe what was said at the first meeting and second meeting, and describe the transaction as best you remember?

"A *Well, we went down there and talked to them. We asked them if they wanted to sell their timber. They said 'if it was worth it,' if they could make enough out of it they would sell it, and they asked us to go out and look it over and see how much we thought there was there. We went out there, I and my brother Tom, we figured there was probably—*

"* * * * *

"Q (Mr. Thornton) Very well, the first time you looked at the property did Mr. or Mrs. Sheets go with you?

"A No, nobody went with us.

"* * * * *

"Q Then when did you next have any conversation relative to the purchase of this timber?

"A Three days afterward in the evening.

"Q Who was present then?

"A The same.

"Q What was said?

"A *We had a contract there, we had it made up by his wife* [Floyd Powell's wife] *and it wasn't suitable to them. They said another thing, they*

*didn't have a bridge in there on it and they wanted a bridge put on there because it made it legal, so we said 'O. K. we will go down and talk to a lawyer or somebody to draw it up'. We asked them if Emil Muller would be O. K. They said 'All right'.*

" * * * * *

"Q What part, if any, did you take—did you assist anyone in placing this description on it?

"A Yes, I believe he wanted—Muller wanted to put it on the whole eighty.

"Q You wouldn't be permitted to testify what was said outside of Mr. and Mrs. Sheets' presence. When did you put your signature on this paper?

"A I don't know, a few days after we presented the other contract, Sheets and his wife were present and we were.

"Q Following the signing of the contract when did you next see Mr. and Mrs. Sheets?

"A It was when we had the cruiser, surveyor." (Italics ours.)

On cross-examination, the witness further testified:

"Q First time you ever met them?

"A Yes.

"Q —When you went there this time to inquire about timber?

"A Yes.

"Q Just what was that conversation you had with them then?

"A It was about buying timber over there.

"Q Relate the conversation substantially the best you can.

"A *We went in and asked them if they wanted to sell their timber. He said he didn't know, he might, he said, if there is enough to justify him he would sell it, if we thought there was that much there.*

"Q If you thought what was there?

"A *If we thought there was enough there to justify it.*

"Q What else did he say about the timber?

"A I don't remember anything else.

"Q Then you went and looked at the timber?

"A Yes, we went right away, I believe.

"Q Did you go back to see Sheets that day or later?

"A We come right back across the fields, we told them what we thought there would be, approximately.

"Q What did you tell them?

"A We figured there was around four hundred thousand.

"Q What else was said?

"A *He says 'That is fine'. He didn't have no idea that there would be that much there, that is more than what he figured.*

"Q Then when did you meet next time?

"A *When we come back he says 'Come back and I will let you know in a few days', I think it was two or three days afterward.*

"Q That is the next trip you went back with this agreement that your brother's wife prepared?

"A Yes.

"Q You think the agreement that you actually signed contained about the same provisions as the one your brother's wife prepared except for the bridge and the two year period?

"A I think so; it might have been worded a little different because he can write up a little better than she did.

"Q Mr. Sheets told you 'no', he wouldn't sign it?

"A Yes, that is right.

"* * * * *

"Q All right then, what did you do when he said he wouldn't sign that contract?

"A *Well, we asked him if it would be all right if we took it before the lawyer Muller, and we asked him if he knew him. He said it would be all right*

*if it was made up before a notary public in legal form. I don't remember whether we took it back to him to put the bridge on it or whether we had that bridge on it—I think we had a bridge on it at the same time we got him to sign it.''* (Italics ours.)

The testimony of plaintiff Floyd Powell did not add anything to that of his brother quoted above.

It thus appears from plaintiffs' own testimony that at no time prior to the actual signing of the contract did the parties come to any understanding as to what was to be sold and purchased, as to the price to be paid, nor as to any other details of an agreement except possibly the mention of a bridge. According to this testimony, the first and only understanding or agreement between the parties, oral or written, was that contained in the writing executed on November 8. This was the contract prepared by plaintiffs themselves and submitted to defendants for their signatures. If in the negotiations prior to the execution of this contract an oral understanding had been reached between the parties as to the terms of the contract to be formally executed, and in the preparation and execution of such written agreement a term agreed upon had been mistakenly omitted or misstated, there might have been some ground for a reformation of the contract to conform to the actual agreement of the parties. But that is not the situation in this case.

We now quote briefly from the direct testimony of the defendant Robert A. Sheets:

"Q Now, Mr. Sheets, I want you to start in with the first time you met the Powells and tell us just all your conversations with them—when did you first meet them, about?

"A It was along the first part of November in '49.

"Q Where did you meet them?

"A They came to my house and inquired about buying my timber.

"* * * * *

"Q Both of them present?

"A Yes, they were.

"Q Just what was said there about your timber?

"A They came around the day before and talked to my wife, they wanted to buy both forties. I asked them what they thought it was worth, what they could pay for it—I had been offered money for it before—they said they could pay four dollars and seven dollars for both pieces.

"Q Anything further said about what you were willing to take?

"A I told them that was satisfactory for the piece in the north forty, but for the piece below there was a lot of old-growth in it and very fine timber, I had been offered three thousand dollars cash for it and turned it down, I had to have more than that.

"Q Did you name an amount at that particular time that you would sell the south forty for?

"A I told them I would like to have four thousand dollars for it.

"Q Then what did they say to that?

"A Well, one of them seemed to think it was all right, the other one didn't; they said they made a rough cruise, they would get their figures together and see just what they could get me, they were pretty sure they could give me four thousand.

"* * * * *

"Q But when you did see them, what?

"A The fallers had been in before that.

"* * * * *

"Q When did you see the Powells after that?

"A That was possibly a week or so, that was right through there they started falling, I worked

the next day, it was either the latter part of that week or the first part of next they came around.

"Q Is that the time they brought the contract?

"A They had their contract with them at that time, yes.

"Q Is that the contract that was signed?

"A Yes, that is the contract.

"\* \* \* \* \*

"Q That was on the second occasion that the contract which you signed, appeared here, which we admit was signed, was about the second time they called at your house?

"A That is right.

"Q Now, Mr. Sheets, I want to ask you a very direct question: Did you know when you signed that contract that that contract referred to the north forty?

"A Absolutely.

"Q Was it discussed there at the time what they were going to do about the south forty?

"A They said we would have the actual cash, but they would cold-deck some of those logs and get some folks bidding on it, they could raise the cash and pay me off and go out there and log it."

The testimony of defendant Frances J. Sheets corroborated that of her husband.

It appears from the testimony of the timber fallers employed by plaintiffs that they commenced felling the timber on the south forty on November 4, or some four days prior to the execution of the written contract. They also testified that plaintiffs had directed them to fell that timber first and then proceed to fell the timber on the north forty.

It also appears from the testimony of Floyd Fold, who is engaged in the logging business and resides Tillamook, that in June, 1949, he offered defendants lump sum of $3,000 cash for the timber on the south

forty, which offer defendants rejected. It is significant that had defendants agreed to sell the timber on the south forty on a stumpage basis as provided in the contract respecting the timber on the north forty, the total price they would have received therefor would have been substantially less than $2,000. It is highly improbable that defendants would have entered into a contract covering the timber on the south forty as claimed by plaintiffs, when to do so it would have meant an unnecessary sacrifice of more than $1,000 from the cash sum offered by Foland. The overwhelming weight of the evidence and all the circumstances of the case support the position of defendants. It is obvious that if the sale of the timber on the south forty was to be for cash, no written contract as to that tract was necessary; whereas, it was advisable, at least, to have a written contract setting forth the terms of sale on a stumpage basis as to the timber on the north forty.

■ It is a general rule of equitable jurisprudence that, where the court has assumed jurisdiction for one purpose, it will retain it for all purposes, legal and equitable, connected with the pincipal controversy; but the rule is permissive rather than peremptory and will not be applied so as to defeat the fundamental rights of litigants or to violate the basic doctrines of pleading; and it may not be invoked where no ground of equitable jurisdiction has first been asserted and established. *Friedenthal v. Thompson,* 146 Or 640, 647, 31 P2d 643; *Sandy Holding Co. v. Ferro,* 144 Or 466, 471, 25 P2d 561; *Union Central Life Ins. Co. v. Kerron,* 128 Or 70, 75, 264 P 453; *Everson et al. v. Haun et al.,* 106 Or 612, 624, 213 P 135; *Templeton v. Bockler,* 73 Or 494, 509, 144 P 405; 30 CJS, Equity, 414, § 67.

Equity jurisdiction will not be retained to grant

legal relief where no right to equitable relief is established. To grant legal relief as an incident to equitable jurisdiction, it is necessary not only that the complaint state a cause of suit in equity, *but also* that the proof establish a matter of equitable cognizance.

In 30 CJS, Equity, 427, § 73, the rule is stated thus:

"The rule considered in the preceding sections that, where the equitable jurisdiction of a court is once brought into action in a proper case, the court will retain jurisdiction of the parties and the subject matter in order to do complete justice to all concerned, even in some instances to the extent of enforcing purely legal rights, applies as a general rule only when the court retains the original case in order to grant some substantial equitable relief. * * * *even where the bill states a case entitling complainant to equitable relief, if the proof fails to establish the averments of the bill in that respect the court is without jurisdiction to proceed further and determine rights that are properly cognizable in a court of law.* In other words, equitable rights must be both averred and proved before purely legal rights will be determined by a court of equity." (Italics ours.)

In *Oregon-Wash. R. & N. Co. v. Reed,* 87 Or 398, 412, 169 P 342, 170 P 300, this court said:

"* * * This being so, the element of damages which the defendants may have sustained is necessarily eliminated, for the right to recover such compensation in a suit must depend upon some equity which enables the court to secure and retain jurisdiction of the subject matter, and as an incident thereof to award the damages inflicted: [citing Oregon decisions]. Where, however, at the hearing of a cause if it be found that the equity upon which the case was predicated does not exist, the suit is thereupon terminated and cannot be tried for the purpose of ascertaining any alleged legal

right that may exist between the parties: [citing cases].

"The rules of law thus firmly established in this state preclude an examination of the questions of damages alleged in the cross-bill when the proof shows there was no equity therein."

Also see *Oregon Growers' Co-op. Assn. v. Riddle,* 116 Or 562, 569, 241 P 1011.

The latest expression of this court upon this matter is to be found in *Ward v. Town Tavern et al.,* 191 Or 1, 38, 228 P2d 216, where Mr. Justice ROSSMAN stated the rule as follows:

"Possibly the defendant's failure to move for a transfer to the law side of the court was due to a belief that when equity has once taken hold of a controversy, it retains jurisdiction and grants legal relief even though plaintiff wholly failed to establish any basis for equitable jurisdiction. This court, however, held in Oregon Growers' Co-operative Association v. Riddle, 116 Or. 562, 241 P. 1011:

"'Equitable rights must be both averred and proved before purely legal rights will be determined by a court of equity.'

"* * * * * *

"In the present instance, the plaintiff alleged a basis for equity jurisdiction, but failed to prove it."

And in the instant litigation plaintiffs alleged a basis for equity jurisdiction, but wholly failed to prove it.

■ Unless the contract was reformed, the only sum of money plaintiffs would be entitled to recover from defendants would be the amount of their expenditures for felling and bucking the timber. Their claim to the profits realized from the sale of the logs is based solely upon the written contract and could not exist

unless the contract was reformed as prayed for by them in their original and supplemental complaints. The trial court found that plaintiffs had expended $1,471.21 in felling and bucking. The record discloses that defendants offered to pay plaintiffs for those expenditures and continued such offer upon the oral argument in this court. In no view of the case, as established by the evidence, were plaintiffs entitled to recover profits. Therefore, there was no basis in fact for an accounting as to profits. Whatever claim plaintiffs may have had against defendants for reimbursement for the expenditures incurred by them in felling and bucking the timber was purely legal.

Plaintiffs argued in their brief that the facts alleged in their original and supplemental complaints entitled them, on the theory of unjust enrichment, to the relief awarded by the decree of the trial court. They cite the following authorities: 46 Am Jur, Restitution and Unjust Enrichment, 99; 12 Am Jur, Contracts, 502, § 6.

There might be cases in which relief against unjust enrichment would be of equitable cognizance, but such is not the case here. The basis of a recovery of money upon the theory of unjust enrichment is the existence of a quasi contract, or a contract implied by law. The rule is stated in 12 Am Jur, Contracts, 503, § 6, as follows:

"* * * Where a case shows that it is the duty of the defendant to pay, the law imputes to him a promise to fulfil that obligation. The duty, which thus forms the foundation of a quasi-contractual obligation, is frequently based on the doctrine of unjust enrichment."

It is elementary that an action solely for money, based upon a contract, express or implied, is an action

at law. To recover for the expenditures made by plaintiffs in bucking and felling the timber, an action at law for money had and received is a proper remedy.

In 58 CJS, Money Received, 906, § 1, it is stated:

"The term 'money had and received' is the technical designation of a form of declaration in assumpsit, wherein plaintiff declares that defendant had and received certain money, etc. Although an action at law, an action for money had and received is equitable in its nature and is governed by equitable principles. It may, in general, be maintained whenever one has money in his hands belonging to another, which, in equity and good conscience, he ought to pay over to that other. *Recovery in such case is based on a promise implied by law or quasi contract and on the equitable principle that one who has been unjustly enriched at the expense of another is required to make restitution.*" (Italics ours.)

While the general rule is that an action for money had and received lies only where money has been received by defendant, the action may nevertheless be sustained where no money has actually passed, but something has been received as money or has been really or presumptively converted into money before action is brought. 58 CJS, Money Received, 911, § 2.

 Plaintiffs' original complaint fails to state facts sufficient to constitute a cause of action for money had and received, or any other cause of action at law. We must look to the supplemental complaint, if permitted to do so, to find any statement of facts that might have warranted the entry of a judgment against defendants upon the theory of unjust enrichment.

In *Clark v. Morrison,* 80 Or 240, 245, 156 P 429, this court said:

"We do not discuss the allegations of the supplemental complaint, for the reason that an original

complaint which states no cause of action cannot be remedied by a supplemental pleading setting up matters which have occurred since the commencement of the action: 31 Cyc. 504; 21 Ency. Pl. & Pr. 18, 19.''

A supplemental complaint is a complaint filed by the plaintiff after the filing of the original complaint to bring forward facts that have transpired since the institution of the suit, which may tend to strengthen or reenforce the cause of action. *Title & Trust Co. v. U. S. Fid. & Guar. Co.*, 138 Or 467, 502, 1 P2d 1100, 7 P2d 805.

In 71 CJS, Pleading, 728, § 330b, the following rule is stated:

"A supplemental complaint or petition must be consistent with, and in aid of, the cause of action set forth in the original complaint; and, in the absence of a statute to the contrary, a new and independent cause of action cannot be set up by such complaint or petition, although it may have arisen out of the same contract or transaction that forms the basis of the suit, especially where the new cause of action is one to which plaintiff was not entitled when he commenced the action or where judgment has already been obtained by him in the original action. * * *

"* * * Any facts which further develop the original right of action, or extend or vary the relief, have been held to be available by supplemental complaint even though they, of themselves, constitute a right of action."

Manifestly, the allegations of the supplemental complaint in this case are not in aid of, nor do they tend to develop, the original cause of suit. Upon the question of whether or not the contract was subject to reformation, the facts set forth in the supplemental complaint are wholly irrelevant. They become relevant

and material only if and when the contract is reformed as prayed for in the original complaint. When the original cause of suit failed, the supplemental complaint became wholly ineffective for any purpose.

Under the circumstances of this case, when the evidence wholly failed to establish a right in plaintiffs to have the contract reformed, the equity court lost jurisdiction to proceed further, and the suit should have been dismissed. There was nothing left to be transferred to the law side of the court. The trial court erred in retaining equitable jurisdiction and in entering judgment against defendants.

The decree is reversed, and this cause is remanded with directions to dismiss the suit. Neither party to recover costs.